UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

JOWENKY NUNEZ, SR.,
Defendant.

22-CR-293 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

On February 11, 2026, following a jury trial, Defendant Jowenky Nunez, Sr. ("Nunez") was convicted of racketeering conspiracy and narcotics conspiracy, as well as attempted murder in aid of racketeering and two firearms offenses. (ECF No. 800.) He was acquitted of four other counts charging violent crimes in aid of racketeering and related firearms offenses. (*Id.*) Nunez now moves pursuant to Rule 29 of the Federal Rules of Criminal Procedure to vacate his convictions on the two counts arising from the attempted murder. In the alternative, and as to his remaining convictions, he moves for a new trial pursuant to Rule 33.

## I. Background

On June 18, 2025, a grand jury returned a superseding indictment charging Nunez on nine counts. (ECF No. 659.) Count One charged Nunez with racketeering conspiracy in connection with his membership in a criminal organization known as "Own Every Dollar," or "OED." (*Id.* at 1-6.) Counts Two and Three charged Nunez with attempted murder and assault with a dangerous weapon in aid of racketeering and with a related firearms offense as to events occurring on April 18, 2020. (*Id.* at 6-8.) Counts Four and Five charged the same offenses as to events occurring on July 18, 2020, and Counts Six and Seven charged the same offenses as to events occurring on August 12, 2021. (*Id.* at 8-11.) Count Eight charged Nunez with conspiring to distribute and possess with intent to distribute cocaine, marijuana, oxycodone, ecstasy,

fentanyl, and heroin. (*Id.* at 11-12.) Count Nine charged Nunez with using and possessing a firearm in connection with the narcotics conspiracy. (*Id.* at 12-13.)

Nunez's trial began on February 2, 2026, and concluded on February 11, 2026. The Government called twenty-one witnesses, including a narcotics trafficking expert (ECF Nos. 813, 815, 817, 819, 821, 823, 825, 827 ("Tr.") at 420-450, 459-60[1]); New York City Police Department ("NYPD") Sergeant James Gilson (*id.* at 870-97); retired Task Force Officer and NYPD Detective Oscar Rivas (*id.* at 639-717); Task Force Officer Christopher Goldrick (*id.* at 899-907); and three cooperating witnesses: Ariel "8Ball" Olivier (*id.* at 83-263), D'Angel Hernandez (*id.* at 330-82, 404-08), and Allen "Smerf" Ferreira (*id.* at 461-576). The Government also introduced dozens of exhibits, including surveillance video and social media evidence. (ECF No. 811 ("Opp.") at 3-7.) The defense did not call any witnesses.

The evidence at trial showed that as a member of OED, Nunez, who was known as "Bala," carried guns and sold drugs for the gang. (Tr. at 90-91, 348-49, 351, 355, 468-69.) He was among OED's more experienced members, and he taught younger members how to deal drugs and handle firearms. (*Id.* at 91, 484, 487-88.) Ferreira testified that Nunez was "part of OED," that he had witnessed Nunez commit "[s]hootings," and that he had seen Nunez carrying a firearm "[m]ultiple times." (*Id.* at 468-69.) Hernandez testified that he heard Nunez tell other members of OED to "always have your ammo ready," and to "[p]ut a glove on . . . so you don't get your fingerprints on the gun or the ammo." (*Id.* at 362, 364.) Nunez sold narcotics to an undercover officer on at least five occasions. (Opp. at 4.) He also secured a supplier who

[1] Page numbers in this citation and in other citations to trial transcript refer to the internal pagination. All other page numbers in citations to the record refer to the PDF pagination.

provided OED with approximately 500 grams of heroin laced with fentanyl each week. (Tr. at 492-94.)

Counts Six and Seven arose from a confrontation on the morning of August 12, 2021, in Washington Heights. Sergeant Gilson testified that he responded to a report of shots fired near 183rd Street and St. Nicholas Avenue at approximately 7:00 or 7:15 a.m., and that he then learned of a separate incident at 1408 St. Nicholas Avenue, which he described as "a dispute involving a firearm." (*Id.* at 871-73.) Asked how a firearm was involved, Gilson testified: "It was displayed. It was pointed at the vehicle." (*Id.* at 873.) Surveillance video of that incident was admitted as Government Exhibit 204A, and Gilson testified that a person depicted in it had "what appears to be a firearm in his hand." (*Id.* at 874-75.) The video shows that person conferring with someone seated in a car, walking away, returning, and raising his arm toward the car as it drives off. (GX 204A; ECF No. 809 ("Mem.") at 6; Opp. at 9.) Olivier identified still images from the video as depicting Nunez and a dealer known as "Chulo." (GX 204M, 204R; Opp. at 9.)

Olivier testified that Hugo "Juice" Rodriguez was the "Duarte" of OED, which Olivier characterized as the "leader of the gang," that Rodriguez sold heroin and crack cocaine on 182nd Street while Nunez sold heroin between 187th and 191st Streets, and that Rodriguez had robbed Chulo in August 2021. (Tr. at 137-38, 240-44.) Neither Olivier nor Ferreira witnessed the events of August 12, 2021. (Mem. at 6-8.) Olivier testified that OED member Victor Colon told him via videochat that "Juice and Bala had just shot at each other," and that Rodriguez later told him that "Bala had pulled a gun out on him and cocked it back." (Tr. at 110, 244.) Ferreira, who was then incarcerated, testified that Rodriguez told him that he had gotten "flocked at" by "Nunez, Jr.'s pops," that "flocked at" was "code" for "getting shot at," and that Nunez believed

he had to defend his son's territory because Rodriguez was taking his son's customers. (*Id.* at 560-63, 608-09.) Neither Rodriguez nor Colon testified at trial. (Mem. at 7, 17.) The Government's narcotics expert also testified that violence can occur within a drug trafficking organization's own territory when there are disagreements over customers. (Tr. at 448.)

Ferreira testified on February 4 and February 5, 2026. (Opp. at 16.) On cross-examination, defense counsel asked whether he had told the Government in June 2022 that Nunez was not a member of OED. (Tr. at 583.) Ferreira responded that he had "met with the government over 25 times" and could not "recall everything that was said in each meeting," but that "if you show me something, it could refresh my memory." (*Id.*) Defense counsel then showed him notes taken at a June 27, 2022 proffer session, which include the entries "Not OED" and "Not gang affiliated." (*Id.* at 585; Opp. at 16-17, 16 n.4.) Ferreira stated that the notes did not refresh his recollection and, as to gang affiliation, that "[t]o my knowledge, I never said that." (Tr. at 585-86.) He was excused at the conclusion of his testimony. (*Id.* at 629.)

During a break in the subsequent testimony of Detective Rivas, defense counsel raised their intent to question Rivas about the June 2022 proffer in order to impeach Ferreira under Federal Rule of Evidence 613. (*Id.* at 682-83.) The Court reserved decision and received letter submissions from both parties. (*Id.* at 694-95; ECF Nos. 794, 795.) On February 6, 2026, the Court ruled that the notes were inadmissible, explaining that "what's clear from the *Almonte* case is that the notes don't come in," including because "the notes are not a transcript of anything the witness said." (Tr. at 912.) The Court nonetheless permitted defense counsel to question Rivas outside the presence of the jury. (*Id.* at 913-14.) Rivas testified that he "was present in proffers" but could not recall the date, and that the notes did not refresh his recollection. (*Id*. at 932-33.) He further testified that proffer sessions are not recorded or transcribed, that one participant takes

notes, and that an Assistant United States Attorney took the notes at the session at issue. (*Id.* at 934-37.) On February 8, 2026, Nunez filed a supplemental letter motion seeking to admit the notes and to call that Assistant United States Attorney, and the Government responded in opposition the same day. (ECF Nos. 796, 797.) The Court denied the motion, which it treated as one for reconsideration, finding the notes "clearly precluded." (Tr. at 939-40.)

Hernandez testified on February 4, 2026. (Opp. at 24.) He stated, among other things, that he saw Nunez at an OED house in Pennsylvania on multiple occasions and that he witnessed Nunez instructing others there about firearms and the drug business. (Tr. at 337-38, 347, 355-56, 362-63, 369.) On cross-examination, defense counsel elicited that Hernandez had not mentioned Nunez at a series of earlier meetings with the Government, using proffer notes at several points to refresh his recollection. (*Id.* at 394-400.) Counsel also elicited that Hernandez "finally mention[ed]" Nunez at an April 2022 meeting, and that in preparing to testify he had "spoke[n] . . . extensively about Mr. Nunez" and "remembered a lot of detail from 2020." (*Id.* at 399, 403.)

The Government moved by letter on February 4, 2026 to admit Hernandez's prior consistent statements, and Nunez responded the following day. (ECF Nos. 790, 791.) The Court permitted the Government to introduce, pursuant to Federal Rule of Evidence 801(d)(1)(B), evidence that Hernandez had made statements at the April 2022 meeting consistent with his trial testimony. (Opp. at 26.) Over the defense's hearsay objection, the Government introduced those statements through Task Force Officer Goldrick, including that "Bala was also always at 912 [Birch Street] trying to teach Juju what to do," and that Hernandez had recognized a photograph of Nunez as "Bala, Juju's dad." (Tr. at 903-07.) In admitting the statements, the Court found "a reasonable basis and a sufficient basis for concluding that . . . the Hernandez proffer notes from that [April 2022] session are an accurate reflection of his words," noting that Hernandez never

disclaimed their content and "testif[ied] consistently with them." (*Id.* at 940.) The Court further explained that prior consistent statements are governed by a different rule than prior inconsistent statements, entailing "different standard[s]" that "justif[y] . . . different positions." (*Id.* at 941.)

In its rebuttal closing, the Government argued that the surveillance video of the August 12, 2021 incident would show Nunez "raise his gun," "motion to the car," and then "continue to pursue with his gun raised," and it invited the jury to "look at it for yourself during your deliberations." (Tr. at 1099.) The defense did not object to those remarks. (Mem. at 18.) The Court instructed the jury, without objection, that to commit attempted murder under New York Penal Law Section 110.00, a person must be "on the verge of actually committing intentional murder," and that "mere preparation is not sufficient." (Tr. at 1158; Opp. at 12.)

On February 11, 2026, the jury returned its verdict. (ECF No. 800.) It found Nunez guilty on Count One and found that the Government proved both acts involving murder and acts involving drug trafficking, in each instance more than two such acts. (*Id.* at 1-2.) It acquitted Nunez on Counts Two and Four, charging violent crimes in aid of racketeering, and on Counts Three and Five, the corresponding firearms counts, leaving the subparts of those counts blank as the verdict form directed. (*Id.* at 2-3.) On Count Six, the jury found Nunez guilty, finding attempted murder proved but assault with a dangerous weapon not proved. (*Id.* at 3-4.) On Count Seven, it found Nunez guilty and found that the firearm was brandished but not discharged. (*Id*. at 4.) On Count Eight, it found Nunez guilty and found that the conspiracy involved 400 grams or more of fentanyl, one kilogram or more of heroin, less than twenty-eight grams of cocaine base, and quantities of both cocaine and ecstasy. (*Id*. at 4-5.) The jury also found Nunez guilty on Count Nine. (*Id.* at 5.)

Following his trial, Nunez moved on February 26, 2026 for a judgment of acquittal on Counts Six and Seven or, in the alternative, for a new trial on those counts and on all other counts of conviction. (ECF No. 806.) He filed a supporting memorandum of law on April 24, 2026. (Mem.) As to Counts Six and Seven, Nunez argues that the evidence was insufficient to prove that he intended to kill Rodriguez or that he came dangerously near doing so. (*Id.* at 14-18.) He further argues that the Government invited the jury to draw a specious inference in its closing rebuttal when it offered a possible explanation for Nunez's gesture toward the woman seen exiting the car in surveillance video. (*Id.* at 18-19.)

Pursuant to Rule 33, Nunez also seeks a new trial on all other counts of conviction, and on Counts Six and Seven if his motion for acquittal is denied. (*Id.* at 19.) He identifies two evidentiary rulings that he contends were prejudicial: the Court's exclusion of notes from Ferreira's June 2022 proffer, offered as impeachment evidence, and its partial admission of notes from Hernandez's April 2022 proffer as a prior consistent statement. (*Id.* at 20-26.) With regard to Ferreira, Nunez summarily renews his argument from trial that the notes were admissible under Federal Rule of Evidence 613 as extrinsic evidence of a prior inconsistent statement. (*Id.* at 21.) He also advances a new argument that the notes satisfy the residual hearsay exception set forth in Rule 807. (*Id.*) Nunez also presents two constitutional theories, contending that excluding the notes deprived him of the only material evidence available to impeach Ferreira, and that the Government's failure to preserve Ferreira's statements violated due process even if the Court's evidentiary ruling was correct. (*Id.* at 24-25.) As to Hernandez, Nunez contends that the Court erred in admitting a portion of the April 2022 proffer notes as a prior consistent statement under Rule 801(d)(1)(B). (*Id.* at 25-26.) Beyond renewing his objection to admitting the statement itself, he argues that the Government neither laid a foundation for nor justified the

introduction of two levels of hearsay: Hernandez's statement and the notes recording it. (*Id.*) The Government responded in opposition on May 22, 2026. (Opp.) Nunez replied via letter on June 5, 2026. (ECF No. 812 ("Reply").)

## II. Legal Standards

### A. Rule 29

Rule 29 allows a court to "set aside the verdict and enter an acquittal" upon a defendant's motion following a jury conviction if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. To prevail, a defendant must meet a "'heavy burden' of showing that 'no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt.'" *United States v. Mensah*, 515 F. App'x 59, 61 (2d Cir. 2013) (summary order) (quoting *United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010)). In considering a Rule 29 motion, a court must "view the evidence in the light most favorable to the government, credit[] every inference that could have been drawn in the government's favor, and defer[] to the jury's assessment of witness credibility and . . . the weight of the evidence." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). "[C]hoosing among permissible competing inferences" arising from the evidence presented is a task reserved "for the jury, not a reviewing court." *United States v. Salemo*, 499 F. App'x 110, 112 (2d Cir. 2012) (summary order) (quoting *United States v. Coppola*, 671 F.3d 220, 239 (2d Cir. 2012). A valid verdict may be "based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quotation marks omitted).

### B. Rule 33

Rule 33(a) empowers courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts have "broad discretion . . . to set aside a

jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quotation marks omitted). However, such motions "are disfavored in [the Second] Circuit," *United States v. Figueroa*, 421 F. App'x 23, 24 (2d Cir. 2011) (summary order) (cleaned up), and only to "be [granted] sparingly and in the most extraordinary circumstances," *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (quotation marks omitted). On a Rule 33 motion, a court "may weigh the evidence and evaluate the credibility of the witnesses," but it may not "freely substitute [its] assessment of the credibility of witnesses for that of the jury simply because [it] disagrees." *United States v. Mizrahi*, No. 22-CR-650, 2024 WL 3824104, at *3 (S.D.N.Y. Aug. 15, 2024) (quoting *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)). Although the Court need not view the evidence in the light most favorable to the verdict when evaluating a Rule 33 motion, such a motion should not be granted "unless the evidence preponderates [so] heavily against the verdict . . . that it would be manifest injustice" to let it stand. *Archer*, 977 F.3d at 188 (quotation marks omitted). Ultimately, a Rule 33 motion should be granted only where there is "a real concern that an innocent person may have been convicted." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quotation marks omitted).

## III. Discussion

### A. Rule 29 Motion

#### 1. Sufficiency of the Evidence

Under New York law, a person is guilty of an attempt to commit a crime "when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." N.Y. Penal Law § 110.00. The underlying offense of second-degree murder requires that a defendant cause the death of another with the intent to do so. *Id.* § 125.25(1). The threshold in proving an attempt is whether the defendant came "dangerously near commission of

the completed crime" through conduct beyond "mere intent or mere preparation." *People v. Lendof-Gonzalez*, 36 N.Y.3d 87, 92-93 (2020) (quotation marks omitted). Brandishing a firearm is generally insufficient, absent more, to prove attempted murder under New York law. *See United States v. Desena*, 287 F.3d 170, 179 (2d Cir. 2002). But shooting at an individual, or individuals, or attempting to, suffices to establish both the intent and the dangerous proximity that an attempt requires. *See People v. McDowell*, 216 A.D.2d 419, 420 (2d Dep't 1995). The Second Circuit has cautioned, however, that there is no "bright-line rule that . . . the defendant must have had his finger on the trigger or gone so far as to fire an errant shot." *Desena*, 287 F.3d at 179.[2]

Nunez seeks vacatur of his convictions on Counts Six (attempted murder in aid of racketeering) and Seven (brandishing a firearm in connection with a crime of violence). (Mem. at 14; ECF No. 659 at 10-11; ECF No. 800 at 3-4.) He contends that the evidence was insufficient to prove that he intended to kill Hugo "Juice" Rodriguez, that he fired or attempted to fire the alleged firearm, or that Rodriguez was in the car at which Nunez pointed his gun. (Mem. at 4.) Nunez recites a litany of details that he claims the Government failed to prove, seeking to analogize this record to those held insufficient to sustain attempted murder convictions in *People v. Chandler*, 250 A.D.2d 410 (1st Dep't 1998), and *People v. Mendez*, 197 A.D.2d 485 (1st Dep't 1993). (Mem. at 15-18.) But in those cases, the Government adduced no evidence—besides the lone act of brandishing a gun—to establish that the defendant came dangerously close to committing the offense. *See Chandler*, 250 A.D.2d at 411; *Mendez*, 197

---

[2] Because the elements of attempted murder are not reducible to "bright-line rule[s]" turning on particular factual permutations, *Desena*, 287 F.3d at 179, Nunez errs in treating a "fully loaded" firearm (Mem. at 17) or statements "like 'I am going to kill you'" (*id.* at 16) as showings that the Government was required to make.

A.D.2d at 485. Indeed, as Nunez correctly notes (Mem. at 15-16), the record in *Desena* yielded a different outcome because of evidence that the defendant "did more than point a gun." 287 F.3d at 179.

Here, the Government presented sufficient evidence on each element of the offense for the jury to convict Nunez on Counts Six and Seven. Most significantly, Ferreira and Olivier each testified that they had been told, by different people and at different times, that Nunez shot at Rodriguez over Rodriguez's narcotics dispute with Nunez Jr. (Tr. at 244, 562.) Nunez construes Olivier's testimony that Rodriguez told him that "[Nunez] had pulled a gun out on him and cocked it back" as undermining any inference that Nunez actually fired his gun. (*Id.* at 244; Mem. at 7.) Yet this statement came just after Olivier testified that Colon told him that Nunez and Rodriguez had "shot at each other," and immediately before Olivier confirmed Nunez's OED membership "at the time of the shooting." (Tr. at 44.) Supporting testimony established Nunez's senior role in OED's criminal activity, including his use of firearms. (*Id.* at 185-86, 240-44, 362-65, 484-88.) The jury also heard testimony tracing the August 2021 altercation to an intra-OED dispute in which Nunez sought to protect his son's drug territory and customers. (*Id.* at 240-44, 562-63.) As the Government's narcotics expert explained, internal disputes of this kind can produce violence within an organization's own territory consistent with the location and events alleged here. (*Id.* at 448.)

That Nunez would have preferred for the jury to discount Ferreira's and Olivier's testimony does not change the fact that their testimony supplied the evidence of dangerous proximity missing in *Mendez* and *Chandler*. Weighing that evidence and "choosing among permissible competing inferences" is the province of the jury, not the Court. *Salemo*, 499 F. App'x at 112 (quotation marks omitted). Nunez's objections—that Ferreira and Olivier were not

percipient witnesses, that Rodriguez was an unreliable narrator who did not testify, and that the video was incomplete—implicate the weight and credibility of co-conspirator testimony that Nunez concedes was admissible. (Mem. at 16-17.) However, "[t]he proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury." *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (quoting *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989)).

Nunez further claims that the Government failed to establish where Rodriguez sat in the car or to explain the conduct of the woman seen exiting it. (Mem. at 17-18.) Yet "lack of corroboration goes to the weight of the evidence, not to its sufficiency," and is again reserved for the jury, which may reach a verdict on the account of a single witness so long as that testimony is "not incredible on its face." *United States v. Gordon*, 987 F.2d 902, 906 (2d Cir. 1993). These asserted gaps concern details surrounding the shooting rather than the elements of the offense, and a court may not "disturb [a jury's] verdict if there is substantial evidence to support it." *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003).[3]

**2. Specious Inference**

In its closing, the Government replayed the surveillance video of the August 12, 2021 incident (GX 204A) and suggested that Nunez had gestured at a woman inside the vehicle to exit

[3] Nunez also asserts that his conviction for brandishing a weapon rather than discharging one on Count Seven (ECF No. 800 at 4) indicates that there is insufficient evidence to support his conviction for attempted murder on Count Six. (Mem. at 8.) But it is well established that "consistency in the verdict is not necessary," *Dunn v. United States*, 284 U.S. 390, 393 (1932) (Holmes, J.), and is not a basis to challenge or set aside a verdict outside the rare instance of "metaphysically impossible" inconsistency within a single count, *United States v. Pierce*, 940 F.3d 817, 822-23 (2d Cir. 2019) (quoting *United States v. Shipley*, 690 F.3d 1192, 1195 (10th Cir. 2012) (Gorsuch, J.)). Indeed, "the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest." *United States v. Powell*, 469 U.S. 57, 65 (1984).

the car because he was holding a real firearm and sought to avoid harming her while attempting to murder Rodriguez. (Mem. at 18.) Nunez now objects that this "new speculative theory" invited an impermissible "specious inference." (*Id.*) Nunez fails to observe, however, the careful distinction his cited authority delineates between impermissible speculation and permissible inferences. *See United States v. Pauling*, 924 F.3d 649, 656-57 (2d Cir. 2019).

Inferences are permissibly drawn from "facts . . . established by either direct or circumstantial evidence," but must be "sufficiently supported" such that a rational juror could find an inferred fact beyond a reasonable doubt when that fact is an element of the offense. *Id.* at 657. In *Pauling*, on which Nunez relies (Mem. at 13), the Second Circuit affirmed the granting of a Rule 29 motion where the Government invited the jury to speculate as to the specific quantity of drugs the defendants had conspired to distribute based only on their past transactions and "close working relationship." *Pauling*, 924 F.3d at 653-55, 662. Absent evidence as to the specific drug quantity, however, "only surmise and guesswork could lead a jury to determine" that the required drug amount had been met. *Id.* at 662. Here, by contrast, the Government replayed a surveillance video for the jury, proposed an explanation for Nunez's behavior in the video, and explicitly invited the jury to "look at [the video themselves] during [their] deliberations." (Tr. at 1099.) The jury was free to draw its own conclusions from the footage, and the Government's gloss on what the video showed did not cross the line into impermissible speculation.

As Nunez correctly acknowledges, Count Seven depends on Count Six because the latter provides the underlying crime of violence. (Mem. at 19.) Accordingly, Nunez's motion to vacate Counts Six and Seven for insufficient evidence is denied.

### B. Rule 33 Motion

#### 1. Testimony of Allen "Smerf" Ferreira

Nunez first argues that a new trial is warranted because the Court excluded the notes of cooperating witness Ferreira's June 2022 proffer, which Nunez sought to admit as evidence that Ferreira had previously told the Government that Nunez was "not OED" and "not gang affiliated." (*Id.* at 20-25.) The premise of Nunez's argument is that "[t]here is no dispute that [] Smerf actually made the inconsistent statements." (*Id.* at 20.) But Ferreira testified that he did not recall either remark and that the notes, which were a shorthand summary he neither reviewed nor adopted, did not refresh his recollection. (Tr. at 583-86.) Nunez offers two evidentiary bases on which to admit the proffer notes: the residual hearsay exception of Rule 807, as well as his submissions at trial regarding Rules 613(b) and 403. (Mem. at 19-25.) He also contends that the unavailability of the proffer notes was a constitutional defect. (*Id.*) The Court addresses each argument in turn.

##### a. Rule 807

Nunez's principal argument regarding Ferreira's testimony is that the residual hearsay exception supplied an alternate path to admit the proffer notes. (Mem. at 21.) Rule 807 permits admission of a hearsay statement not covered by Rule 803 or 804 if "the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement," and if "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). The exception is narrow, "to be invoked 'very rarely, and only in exceptional circumstances.'" *United States v. Kandic*, 134 F.4th 92, 103 (2d Cir. 2025) (quoting *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991)). Evidence offered pursuant to this exception must satisfy five requirements:

"trustworthiness, materiality, probative importance, the interests of justice, and notice." *Gist v. United States*, No. 16-CR-656-6, 2021 WL 3774289, at *14 (S.D.N.Y. Aug. 24, 2021) (quoting *United States v. Griffin*, 811 F. App'x 683, 686 (2d Cir. 2020) (summary order)) (brackets omitted).

Nunez argues that the proffer notes are sufficiently trustworthy under Rule 807 because they are "the official record of the proffer session" and "were taken by an Assistant United States Attorney." (Mem. at 21; *see also* Tr. at 932-37.) Yet the relevant inquiry is whether Nunez can demonstrate that the notes reliably "reflect [Ferreira's] own words." *S.E.C. v. Treadway*, 438 F. Supp. 2d 218, 223 (S.D.N.Y. 2006). A document that "does not contain substantially verbatim statements of any trial witness," and that was never "adopted by any trial witness," is "'irrelevant as an impeaching prior inconsistent statement, and . . . inadmissible.'" *United States v. Ibrahim*, No. 07-CR-543, 2011 WL 1004853, at *1 (E.D.N.Y. Mar. 17, 2011) (quoting *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992) (per curiam)). Moreover, the Second Circuit has declined to admit proffer notes under Rule 807, observing that it is "loath to assume that a statement made by a criminal in debriefings to the government pursuant to a cooperation agreement is categorically 'particularly trustworthy,' as Rule 807 requires." *United States v. Ulbricht*, 858 F.3d 71, 123 (2d Cir. 2017). While the Government concedes that proffer notes are credible in the sense that they reflect good-faith efforts to memorialize meetings (Opp. at 22), their provenance alone does not make them equivalent to a near-verbatim record or otherwise satisfy Rule 807's credibility requirement.[4]

---

[4] Nunez does not individually address the other factors, which may present independent obstacles. *Cf. Gist*, 2021 WL 3774289, at *14-15. Regarding materiality, the shorthand notes do not themselves constitute material evidence. *See infra* § III(B)(1)(ii). Nunez also invoked the residual hearsay objection to admit the proffer notes *after* Ferreira's testimony (ECF No. 796 at 4-6) and without addressing timing except to stress that the Government provided the notes in

**b. Rules 613(b) & 403**

As to Rules 613(b) and 403, Nunez "incorporate[s] and adopt[s] all previous arguments made" at trial without offering additional authority or evidence. (Mem. at 21; *see* ECF Nos. 794, 796.) Those trial submissions were fully briefed and argued, and the Court rejected them twice. (*See* ECF Nos. 795, 797; Tr. at 912, 940.) The governing rule remains the one the Court applied: Absent endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words, and notes reflecting only "that note-taker's summary characterization" are "irrelevant as an impeaching prior inconsistent statement, and thus inadmissible." *Almonte*, 956 F.2d at 29.

The burden of showing that notes capture the witness's own words rather than the note-taker's characterization of those words rests with the party offering them. *Id.* Nunez fails to meet this burden. The proffer notes do not purport to be a transcript, and Ferreira never adopted them. To the contrary, when shown the relevant portions of the notes, Ferreira responded that "that's not what I said," that he "[didn't] remember saying that at all," and that, "[t]o my knowledge, I never said that." (Tr. at 583-86.) That the notes were prepared carefully for law enforcement use does not convert them into Ferreira's words. Additionally, the same ambiguity which makes the notes hearsay independently supports the Court's exclusion of the notes at trial under Rule 403. *See United States v. Ghailani*, 761 F. Supp. 2d 114, 117-18 (S.D.N.Y. 2011).

---

the four weeks preceding trial (ECF No. 794 at 3). This is despite Rule 807(b)'s requirement that a party seeking to admit material provide "reasonable notice of the intent to offer the statement . . . in writing before the trial," unless the court "for good cause, excuses a lack of earlier notice." Fed. R. Evid. 807(b).

### c. Constitutional Considerations

Nunez contends that, even if the Rules of Evidence do preclude admission of the Ferreira proffer notes, a new trial is warranted because his inability to introduce Ferreira's proffer statements, and the Government's failure to record them, were constitutional defects. (Mem. at 24.) Because the notes were at most cumulative impeachment material, these theories are unavailing.

Nunez, citing *Chambers v. Mississippi*, 410 U.S. 284 (1974), and *Giglio v. United States*, 405 U.S. 150 (1972), correctly identifies the constitutional bar against the suppression of material or exculpatory evidence. (Mem. at 24.) He fails to observe, however, the distinction between material impeachment evidence and evidence which "merely furnishes an additional basis on which to challenge a witness whose credibility . . . is subject to extensive attack by reason of other evidence." *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998). Ferreira was a cooperating witness, able to testify to Nunez's conduct only because of his own criminal involvement. (Tr. at 461-576.) At trial, Ferreira's record, motivation, and memory (including of the June 2022 proffer) were accordingly aired and subjected to cross-examination. (*Id*. at 583-86.) Counsel asked Ferreira directly whether he had told the Government that Nunez was not a member of OED and not gang affiliated and showed him the notes in an effort to refresh his recollection. (*Id.* at 583-86.) Excluding the notes did not hamper Nunez's ability to do precisely what the defendant in *Chambers* could not: "test the witness'[s] recollection, [] probe into the details of his [account], [and] 'sift' his conscience so that the jury might judge for itself." *Chambers*, 410 U.S. at 295. Nor was Ferreira the sole witness against Nunez, as the Government relied on Ferreira *and* Olivier's testimony regarding Nunez's use of firearms and acts of violence. (Mem. at 22-23; Opp. at 5-9.) The Ferreira proffer notes are therefore best characterized as cumulative impeachment material, and "[c]umulative impeachment material

cannot serve as a basis for granting a new trial under Fed. R. Crim. P. 33." *United States v. Tuzman*, No. 15-CR-536, 2021 WL 3167708, at *6 (S.D.N.Y. July 27, 2021) (collecting cases).

Nunez also casts the Government's failure to record or transcribe proffer sessions as "gamesmanship" and "machinations" that violated due process by failing to preserve material evidence. (Mem. at 22-23, 25.) In support, he relies on *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), but that case serves only to illustrate the Supreme Court's reluctance to impose an "undifferentiated and absolute duty . . . to preserve all material that might be of conceivable evidentiary significance." *Id.* at 57-58. Absent bad faith, which Nunez expressly disclaims (Mem. at 25), the Government had no obligation to record the proffer. Nor does the routine preparation of nonverbatim notes at a wide-ranging proffer in June 2022, more than three years before trial, suggest bad faith or even the negligence at issue in *Youngblood*. *Id.* at 58.

Fundamentally, Nunez's post-trial arguments presuppose that the proffer note entry suggesting that Nunez is "not OED" and "not gang affiliated" reflects material evidence of an inconsistent or exculpatory statement. But reading such evidentiary import into two sparse bullet points requires supplying and attributing words to Ferreira that he has explicitly disclaimed. (Mem. at 20.) Because the proffer notes offer only cumulative impeachment material and do not otherwise implicate constitutional concerns, their exclusion does not warrant a new trial pursuant to Rule 33.

**2. Testimony of D'Angel Hernandez**

Separately, Nunez contends that a new trial is warranted because of the admission of statements from cooperating witness D'Angel Hernandez's April 2022 proffer, as well as notes recording those statements. (Mem. at 25-26.) While maintaining his objection to admitting the statements at all, Nunez now principally argues that the notes were hearsay within hearsay, with Hernandez's statement forming one layer and the note-taker's writing a second, and that the

Government neither addressed the second layer nor laid the requisite foundation. (*Id.*; Reply at 8.) Neither objection warrants relief. The statements were properly admitted under Rule 801(d)(1)(B) as Hernandez's own prior consistent statements, and the snippet of notes admitted recorded only the statements he endorsed. Additionally, even if the notes should have been excluded, the error was harmless.

A prior consistent statement is not hearsay when it "is consistent with the declarant's testimony" and is offered "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying" or "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B). On cross-examination, counsel asked a series of questions establishing that Hernandez had not mentioned Nunez in earlier meetings with the Government, but had, in preparing to testify at this trial, "spoke[n] . . . extensively about Mr. Nunez" and "remembered a lot of detail from 2020." (Tr. at 386-403.) Counsel also established that Hernandez was scared and knew he was "probably in a lot of trouble" upon his first arrest in 2020, and that, despite multiple meetings with prosecutors, Hernandez "finally mention[ed]" Nunez at the April 2022 meeting. (*Id.* at 388, 399.) Because this line of questioning qualified as ancillary "attacks on [Hernandez's] credibility and memory," Rule 801(d)(1)(B) permitted the admission of prior consistent statements by Hernandez that would otherwise qualify as hearsay. *United States v. Flores*, 945 F.3d 687, 705-06 (2d Cir. 2019).

Nunez argues that the Government nonetheless failed to invoke an exception for the second layer of hearsay—the note-taker's notes. (Mem. at 25-26; Reply at 8.) As a threshold matter, it is a close question whether the Hernandez proffer notes in fact constitute hearsay. *Almonte* advises that a third party's characterization of a witness's statement is not the witness's

prior statement "unless the witness has subscribed to that characterization." *Almonte*, 956 F.2d at 29. When shown the proffer notes repeatedly on cross-examination, Hernandez confirmed their accuracy and testified consistently with them. (Tr. at 394-403.) The Court accordingly found "a reasonable basis and a sufficient basis for concluding that . . . the Hernandez proffer notes from that [April 2022] session are an accurate reflection of his words." (*Id.* at 940.) Additionally, the portion of the notes that was admitted was confined to statements that Hernandez endorsed on the stand. (ECF No. 790-1 at 2, 4.) In short, unlike past cases where impermissible double-hearsay arose from chains of non-witness declarants, here, Hernandez testified as to, and consistently with, the contents of the proffer notes. *Cf. United States v. Cummings*, 858 F.3d 763, 773 (2d Cir. 2017).

In any event, even if the Court erred in admitting the proffer notes, the error was harmless. "Not every hearsay error requires a new trial." *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010). Where error was harmless because the evidence at issue was "unimportant in relation to everything else the jury considered," a court may decline to dispense with a verdict. *United States v. Kaplan*, 490 F.3d 110, 123 (2d Cir. 2007) (quotation marks omitted). In considering harmless error, the principal considerations are: "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *Gomez*, 617 F.3d at 95 (quoting *Kaplan*, 490 F.3d at 123). Relief is warranted where "the erroneously admitted evidence goes to the heart of the case against the defendant, and the other evidence against the defendant is weak." *Id.* (quoting *United States v. Rigas*, 490 F.3d 208, 222 (2d Cir. 2007)).

None of these considerations warrants a new trial. The Government's case was robust and did not depend on the challenged notes. Over eight days, the Government called twenty-one witnesses, including three cooperating witnesses, and introduced surveillance video, social media evidence, and recordings of five narcotics sales to an undercover officer. *See supra* § 1. Unlike the witness at issue in *Kaplan*, the jury had no cause to give greater credence to Hernandez than to the other witnesses, including his fellow cooperators. *See Kaplan*, 490 F.3d at 123. The Government properly sought leave by written motion and carefully redacted the notes after the Court ruled upon briefing from both parties. (ECF Nos. 790, 791; Tr. at 903-07.) It did not elevate the statement at issue or rely on it as a "unique" piece of evidence. *Kaplan*, 490 F.3d at 123-24.

Moreover, the notes were of modest importance. Even if the notes had been excluded, the Government could have elicited the same testimony by using them to refresh Hernandez's recollection, as Nunez's counsel already had. (Tr. at 389-407, 899-907.) Error is harmful where it concerns evidence that "[i]s not duplicative" and provides the very proof "needed" to establish a disputed fact, not where it was fungible and otherwise accessible. *Gomez*, 617 F.3d at 95-96; *see also Kaplan*, 490 F.3d at 123-24. Where an error concerns evidence "of trifling significance" and the record otherwise contains "broad-ranging evidence," a new trial is not warranted, especially under the demanding standard of Rule 33. *United States v. Teman*, 465 F. Supp. 3d 277, 326-27 (S.D.N.Y. 2020), *aff'd*, No. 21-1920-CR, 2023 WL 3882974 (2d Cir. June 8, 2023). The consistency between Hernandez's testimony in 2026 and statement in 2022 further allays concern that the verdict represented a "manifest injustice" or risk of a false conviction. *See Aguiar*, 737 F.3d at 264 (quotation marks omitted). As the admission of the proffer notes was, at most, harmless, Nunez's motion for a new trial on this basis is denied.

**IV. Conclusion**

For the foregoing reasons, Nunez's motion for a judgment of acquittal and for a new trial is denied.

The Clerk of Court is directed to close the motion at Docket Number 806.

SO ORDERED.

Dated: October 13, 2026
New York, New York

J. PAUL OETKEN
United States District Judge